E-FILED
Wednesday, 23 June, 2010  09:23:51 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| CAROL MARIE KENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 09-cv-01162 |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N   &   O R D E R

Before the Court are Plaintiff's Motion for Summary Judgment, filed on November 16, 2009 (Doc. 12) and Defendant's Motion for Summary Affirmance, filed on February 1, 2009 (Doc. 16). Also pending is Plaintiff's Motion for the Entire Record to be Included. (Doc. 13). As the August 21, 2006 decision of the Administrative Law Judge is already a part of the record at Tr. 441-53, the Motion is denied as moot. For the reasons stated below, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Affirmance is GRANTED.

## BACKGROUND

### Procedural History

On April 25, 2005, Plaintiff Carol Marie Kent applied for disability insurance benefits and supplemental security income, claiming she became disabled and unable to work on April 1, 2005. (Tr. 89-98). The agency denied her application initially, and also upon reconsideration. (Tr. 54-58, 60-63). Plaintiff subsequently

requested a hearing on November 8, 2005, which was granted on December 21, 2005. (Tr. 66, 83-88). The hearing was held on June 6, 2006; the Administrative Law Judge's (ALJ) denial of benefits followed shortly after on August 21, 2006. (Tr. 540-578, 441-453).

On August 25, 2006, Plaintiff filed a timely request for review to the Appeals Council. (Tr. 456-462). On June 1, 2007, the Appeals Council remanded the case to the ALJ, finding the ALJ's assessment of Plaintiff's residual functional capacity in the written decision inconsistent with remarks made at the hearing. (Tr. 39). The Appeals Council further noted that while the ALJ's written decision stated that Plaintiff could perform past relevant work, testimony from the vocational expert at the hearing indicated otherwise. (Tr. 40). The ALJ was thus instructed to "give further consideration to the claimant's maximum residual functional capacity," and to revisit and clarify, with a vocational expert, the effects of assessed limitations on past relevant work. (Tr. 40). The ALJ was also instructed to enter into the record additional medical evidence submitted by Plaintiff's attorney. (Tr. 40).

The second hearing was held on November 29, 2007; the ALJ's decision to deny benefits was issued on December 28, 2007. (Tr. 832-877, 19-36). A timely request for review was filed, and subsequently denied by the Appeals Council on January 1, 2008. (Tr. 18A-B, 9-12). The ALJ's decision was therefore the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. The request for judicial review was filed at this Court pursuant to 42 U.S.C. § 406 (g) (2000).

## Medical History

In June 2004, Plaintiff was hospitalized in connection with a bout of herpes simplex meningitis encephalitis. (Tr. 208). Plaintiff contracted bacterial meningitis the first time in 1997, while her herpes infection arose when she was sixteen. (Tr. 205).

Following the June hospitalization, Plaintiff complained of memory loss and overall decreased cognitive function. As a result, Dr. Shanna Kurth, Ph.D., performed a neuropsychological evaluation on August 13, 2004. *See* (Tr. 315-317). Dr. Kurth indicated "mild/moderate memory impairment and mild visuo-spatial processing deficits." (Tr. 316). Dr. Kurth further noted that the "prognosis for significant improvement is difficult to project." (Tr. 316). Rehabilitative services were recommended. (Tr. 316).

In May 2005, Dr. McCalla, Plaintiff's primary care physician at the time, ordered an MRI and EEG in response to her continued complaints of memory loss, migraines, and loss of other cognitive functions. The results were noted as "normal and unremarkable." (Tr. 241).

Dr. Baljit Singh, M.D., performed a psychiatric evaluation on June 8, 2005, following a referral from Dr. McCalla. *See* (Tr. 244-248). Dr. McCalla, in her referral, noted symptoms such as lightheadedness, decreased concentration, anxiety, crying spells, difficulty sleeping, joint and muscular pain, depression, and migraine headaches. (Tr. 241). Dr. Singh noted that Plaintiff was stable on current

medication, though mild depression persisted. (Tr. 246). Plaintiff scored a 3/3 on a memory test given at the evaluation, and Dr. Singh noted her Global Assessment of Functioning (GAF) as 60. (Tr. 246). Plaintiff's mood, thought process, physical functioning, and cognition were all noted as normal. (Tr. 246).

On July 13, 2005, Disability Determination Services (DDS) performed a Residual Functioning Capacity Assessment physical on Plaintiff. *See* (Tr. 263-270). The results stated that Plaintiff could occasionally lift 20 pounds, and frequently lift 10 pounds. (Tr. 264). Furthermore, the report noted that Plaintiff could stand/walk for a total of at least two hours in an eight-hour workday, and sit for six hours. (Tr. 264). Plaintiff's ability to push/pull was found to be unlimited. (Tr. 264). All postural limitations – climbing, balancing, stooping, kneeling, crouching, and crawling – were found to be occasionally limited. (Tr. 265). The only environmental limitation found was for hazards; the report noted that Plaintiff could withstand unlimited exposure to all other environmental considerations. (Tr. 267). Additional comments on the report stated Plaintiff's "muscle strength is 5/5 and gait is normal." (Tr. 270). The comments further asserted that though Plaintiff complains of pain and exhaustion, "this can be expected to improve with continuing medication." (Tr. 270). The report concluded that Plaintiff retains the capacity to perform work related activities, even with pain and exhaustion considered in the assessment. (Tr. 270).

On May 11, 2006 Dr. Rogers submitted a letter on behalf of Plaintiff. (Tr. 418). Dr. Rogers replaced Dr. McCalla as her primary care provider. In the letter, Dr. Rogers stated Plaintiff suffered from numerous conditions, including

"generalized anxiety disorder with depression, hypertension, fibromyalgia, chronic allergic rhinitis with nasal polyps and a history of migraine headaches which were worsened by a bout of herpes simplex meningo-encephalitis in the summer of 2004." (Tr. 418). Dr. Rogers further noted, "At this point there does not seem to be a cure for her various problems," and "the conditions have not been optimally controlled in a consistent manner." (Tr. 418).

Another letter from Dr. Rogers, dated September 5, 2006 stated Plaintiff's conditions "appear to be stable" but she "remains in pain the majority of the time," and "continue[s] to have sleep disturbance, decreased energy, feelings of guilt and worthlessness, and also difficulty concentrating." (Tr. 668). Dr. Rogers further noted Plaintiff "continues to have difficulty remembering what she has done in the last few hours to few days." (Tr. 270). "She has been known to leave her stove on with a pot on it when leaving the house and also forgetting to pick a child up from school when it was her responsibility to do so." (Tr. 270). Dr. Rogers concluded by saying that Plaintiff "appears to be persistently disabled by the above problems." (Tr. 270).

Dr. Rogers' final letter, dated January 1, 2007, stated Plaintiff suffers from "a chronic headache disorder and fibromyalgia." (Tr. 660). Dr. Rogers noted Plaintiff would need to continue taking Darvocet N100 indefinitely, as she did not find adequate pain relief with nonsteroidal anti-inflammatory drugs and is allergic to other narcotics. (Tr. 600).

On April 17, 2007, Jane Valez, Ph.D. and licensed clinical psychologist, performed a psychological evaluation at the request of the Agency. *See* (Tr. 701-02).

Dr. Valez noted Plaintiff's attentional capacity was adequate, and there was no evidence of delusions or hallucinations. (Tr. 702). However, Dr. Valez further noted that Plaintiff was positive for suicidal ideation, and diagnosed her with severe depressive disorder and dementia due to encephalitis. (Tr. 702). Plaintiff's short-term and long-term memory were found "mildly impaired." (Tr. 702). Her GAF was noted as 40. (Tr. 702). Dr. Valez also concluded that claimant could manage her own funds if granted disability. (Tr. 702).

On April 26, 2007, state-agency psychologist Dr. Patricia Beers, Ph.D., performed a Mental Residual Functional Capacity Assessment. *See* (Tr. 747-64). Dr. Beers noted Plaintiff was moderately limited in five categories, including her ability to understand and remember detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination or proximity to others without being distracted by them; ability to respond appropriately to changes in the work setting; and the ability to travel in unfamiliar places or use public transportation. (Tr. 747-748). She diagnosed Plaintiff with an organic mental disorder, mild dementia due to encephalitis, and an affective disorder, major depression. (Tr. 751-754). These resulted in moderate restriction of activities of daily living, and mild restrictions in the areas of social functioning and concentration, persistence, or pace. (Tr. 761). Dr. Beers stated Plaintiff "demonstrates the cognitive abilities needed to understand, recall and execute simple one-to-two step instructions and to carry out more complex routine tasks. Her social skills are adequate. Adaptive capacities vary with mood and pain.

Capable of SGA." (Tr. 749). Dr. Beers indicated plaintiff experienced one or two episodes of decompensation of extended duration (Tr. 761).

On May 17, 2007 Dr. Phillip Budzenski performed an internal medicine consultative exam at the request of the Agency. (Tr. 704-08). Dr. Budzenski noted that Plaintiff's "memory for recent and remote medical events is preserved," and her "intellectual function is grossly normal." (Tr. 705). Plaintiff was able to "walk on toes, walk on heels, and tandem walk," as well as "stand on either leg alone, and… perform a full squat maneuver without difficulty." (Tr. 708.) Dr. Budzenski found no evidence of degenerative disc disease and no evidence of fibromyalgia, as "claimant had no repeatable tender points on today's examination." (Tr. 708). He further opined that Plaintiff "should be able to perform light work with occasional medium work eight hours a day." (Tr. 708). In regards to depression, Dr. Budzenski noted that Plaintiff "appears to continue to have depressive symptomatology." (Tr. 708). He recommended a psychological evaluation for further workplace recommendations. (Tr. 708).

On November 16, 2007 Dr. Rogers completed an Ability to Do Work-Related Activities form, assessing Plaintiff's physical limitations. *See* (Tr. 771-778). Dr. Rogers indicated Plaintiff could occasionally lift 10 lbs; could stand/walk less than two hours in an eight-hour day; and that Plaintiff needs the option to sit, stand, or lie down for pain control. (Tr. 771). He further noted that pushing and pulling is limited in both upper and lower extremities, as "generalized muscle pain and tenderness [are] worsened by activities." (Tr. 772). Dr. Rogers also indicated that

Plaintiff could never climb, kneel, crouch or crawl, and could only occasionally balance and stoop in the course of an eight-hour day. (Tr. 772). Furthermore, Plaintiff could frequently feel and finger, but only occasionally reach and handle. (Tr. 772).  Plaintiff also was found to have limited ability to tolerate temperature extremes, noise, vibration, hazards, and heights. (Tr. 773). Due to "the fluctuating nature of her conditions," Dr. Rogers opined that Plaintiff would likely miss more than 3 days of work per month. (Tr. 773). Dr. Rogers ultimately concluded that the patient is disabled due to the "combination of her memory problems and chronic central pain," and thus unable to be gainfully employed. (Tr. 773-774).

On November 16, 2007 Dr. Rogers also assessed Plaintiff's mental limitations on an Ability to Do Work-Related Activities form. *See* (Tr. 775-778). He indicated moderate limitations in: following work rules, relating to co-workers, dealing with the public, and using judgment. (Tr. 775). Dr. Rogers also noted marked limitations in dealing with stress, functioning independently, and maintaining concentration. (Tr. 775). All of these limitations were due to memory impairment. (Tr. 775). Dr. Rogers next indicated further marked limitations in Plaintiff's ability to understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; and ability to understand, remember, and carry out simple job instructions. (Tr. 776). Again, this was due to Plaintiff's memory impairment. (Tr. 776). Dr. Rogers also indicated slight limitations in Plaintiff's ability to behave in an emotionally stable manner and relate predictability in social situations. (Tr. 776). Plaintiff's ability to

demonstrate reliability was indicated as moderately impaired. (Tr. 776.) Dr. Rogers ultimately concluded that Plaintiff was totally disabled and unable to work in any capacity. (Tr. 777).

## Hearing Testimony

The first hearing was held on June 6, 2006. Plaintiff, 41 years old at the time, appeared before the ALJ accompanied by her attorney. She testified that she lived in a home with her husband, two twin daughters, and her stepson. (Tr. 547). Plaintiff stated she completed two years of college, receiving a certificate for phlebotomy. (Tr. 548). Plaintiff stated she drove occasionally, and worked full time at Family Medical Center in Peoria until March 2005. (Tr. 549). Plaintiff held that position for five years; prior work was in hospital labs drawing blood. (Tr. 549) In total, Plaintiff estimated she worked for six years as a phlebotomist; prior work was in fast food or at Wal-Mart. (Tr. 550).

The ALJ next inquired into Plaintiff's current medical condition. In the last twelve months, Plaintiff stated she made approximately five visits to either Dr. McCalla's office or Dr. Rogers' office. Plaintiff was treated primarily by a nurse practitioner. Dr. McCalla, who was replaced by Dr. Rogers, also ordered a psychiatric evaluation, which resulted in no change of medications. (Tr. 552).

Plaintiff testified her most disabling impairment was memory loss. (Tr. 554). Specific examples included leaving the stove on, getting lost driving, and a poor concept of time. (Tr. 555). Upon examination by her attorney, Plaintiff further

stated that body pains, migraine headaches, and bouts of shingles also impair her daily activities. (Tr. 561). Plaintiff stated that while her kids are at school, she is alone at home, though her husband "could be in and out, he works in sales." (Tr. 555). Plaintiff noted, however, that her husband does occasionally leave town on business for one to two days. (Tr. 556).

Plaintiff noted that her days are occupied by light housework, such as laundry, as well as occasional recreational painting, and television. (Tr. 556-60). Plaintiff noted that all activities were subject to her pain level on a given day, and in fact, much of her day was spent lying down in her bedroom. (Tr. 560).

Plaintiff's husband, Douglas Kent (Mr. Kent), testified that Plaintiff's activity level has changed considerably since the onset date. (Tr. 564). He further stated that Plaintiff is irritable, has memory issues, and frequently is in pain. (Tr. 564-566). Upon cross-examination by the ALJ, Mr. Kent noted that Plaintiff forgot to pick up the kids "probably twice." (Tr. 567). He also noted he was working two jobs at the time, and would arrive home around 11:00 pm every night. (Tr. 569).

The second hearing was held on November 29, 2007. Plaintiff testified that since the first hearing, her chronic pain, migraines, and shingles became worse. (Tr. 838). Mr. Kent also testified to Plaintiff's worsening condition. (Tr. 860). Plaintiff further stated her memory was getting worse, evidenced by her children's remarks and an incident at the grocery store, when she could not recognize an old friend. (Tr. 845). When asked for more specific instances, Plaintiff was unable offer further evidence. (Tr. 846).

Dennis Gustafson, a vocational specialist, also testified at the second hearing. The ALJ proposed a hypothetical person with residual functional capacity to lift less than ten pounds frequently, to sit or stand up to eight hours a day, and the ability to perform simple, unskilled tasks. (Tr. 869-70). Mr. Gustafson stated that such a person would be capable of performing work as a paramutal ticket checker (3,146 jobs in the state), interviewer (1,433 jobs), and approximately 600 other jobs that fall under the general areas of inspection, sorting, sampling, or weighing. (Tr. 870-871). Mr. Gustafson further opined there were approximately 3,000 jobs under the general classification of hand production worker, and approximately 2,000 under material handling. (Tr. 871-72). The majority of those jobs could be done sitting or standing, according to Mr. Gustafson. (Tr. 872-73). Mr. Gustafson noted that all testimony was in accordance with the *Dictionary of Occupational Titles*.

Upon cross-examination by Plaintiff's attorney, Mr. Gustafson stated that two days per month would be a maximum acceptable level of absenteeism for all of the above positions. (Tr. 874). Plaintiff's attorney posed a hypothetical question of the number of listed jobs that would allow an employee to lie down on an at-will basis; Mr. Gustafson posited zero jobs would accommodate the requirement. (Tr. 874). Mr. Gustafson was also asked to ascertain the number of jobs that would be suitable for a person with the conditions noted in Dr. Rogers' letter. *See* (Tr. 668). Again, Mr. Gustafson noted zero jobs.

## ALJ's Decision

On December 28, 2007, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 23).

A. ALJ's Step Three Analysis

The ALJ concluded that, although Plaintiff's impairments were severe, satisfying step two of the five step process, she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 25). In analyzing step three, the ALJ first contemplated Plaintiff's physical impairments, and then analyzed possible affective disorders.

The ALJ stated that Plaintiff's physical impairments of "fibromyalgia and joint pain/arthritis do not meet any musculoskeletal or neurological Listing," and "her hypertension… does not meet… any listed cardiovascular impairment." (Tr. 25). The ALJ further noted that "the claimant is able to ambulate effectively and does not take strong narcotic pain medications or have evidence of spinal stenosis, nerve impingement, joint dysfunction, or evidence of inflammatory disease as contemplated by Listings 1.02, 1.04, 14.09 or any other listed impairment." (Tr. 25). Thus, Plaintiff's physical impairments were deemed insufficient to meet or equal a listed impairment.

The ALJ went on to analyze Plaintiff's affective disorder claims of depression and anxiety under Listings 12.04 and 12.06, respectively. To satisfy these claims, a

claimant must meet (1) both the A and B parts of the code, or (2) the part C criteria. (Tr. 25 citing 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04A, 12.06A (2009)).

The ALJ conceded that the part A criteria was met, "although objective evidence and non compliance of the claimant with her treatment plan renders her assertions of a totally disabling mental impairment not credible." (Tr. 27).

To satisfy part B, the plaintiff must exhibit two of the following: "marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration." (Tr. 27 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04B, 12.06B (2009)). The ALJ found none of the four criteria satisfied.

Plaintiff's limitations in activities of daily living were noted as "slight." (Tr. 27). Though she testified to limited activities, the ALJ found that "her lack of activities may be a matter of choice," as both her daughter and husband spent significant time at home, due to a chronic medical condition and knee injury, respectively. (Tr. 27).

The ALJ found Plaintiff's limitations in social function "moderate," opining, "it seems largely self-imposed as it is not reflected in the medical evidence." (Tr. 27). The ALJ noted that while Dr. Rogers' statement mentioned "generalized anxiety disorder with depression," it does not mention that Plaintiff "is completely isolated and does not go out... or support any of the claimant's assertions regarding her symptoms." (Tr.27). The ALJ concluded that the disconnect between Plaintiff's

testimony at the hearing and the medical evidence provided by Dr. Rogers "demonstrates the claimant is not fully credible in her testimony." (Tr. 27).

Using the evidence provided by Dr. Rogers' statement, the ALJ further concluded that Plaintiff's difficulties in maintaining concentration, persistence, or pace could be defined as "moderate." (Tr.27). Though Plaintiff complained of a need to lie down repeatedly, the ALJ found this and other symptoms to lack medical support, opining that limitations greater than "moderate" are "not supported by her treating physicians." (Tr.27).

Finally, in regards to the fourth element, the ALJ reasoned, "the available evidence does not establish that the claimant has experienced extended episodes of decompensation during the time pertinent to this decision." (Tr. 27).

12.04 and 12.06 have different standards for part C. The criteria for each was addressed in turn by the ALJ, with neither part satisfied, due to evidence that indicates the "claimant can function at least to some extent outside her home and does not require a highly supportive living environment." (Tr. 28).

B. ALJ's Step Four Analysis

As step three of the overall process was not satisfied, the ALJ continued with step four. The analysis consisted of (1) determining the claimant's residual functioning capacity; then (2) determining whether the claimant has the residual functional capacity to perform the requirements of her past relevant work. (Tr. 23-24 (citing 20 C.F.R. § 404.1520(e)—(f))).

A person's residual functional capacity is "her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." (Tr. 23-24). The ALJ first determined whether there are impairments "that could reasonably be expected to produce the claimant's pain or other symptoms." (Tr. 28). He then assessed the "intensity, persistence, and limiting effects" of Plaintiff's symptoms, and in doing so made credibility determinations on Plaintiff's statements, as judged against objective medical evidence.

The ALJ concluded that "objective medical evidence does not support the claimant's assertions of the presence of a totally disabling condition." (Tr. 30). Both the 2005 MRI and EEG were noted as normal, as was a neurological examination. (Tr. 30). The results do not indicate evidence of encephalopathy. (Tr. 30 (citing Exhibit 14F, p. 9)). The ALJ found that these findings do not support Plaintiff's claim of memory loss. Furthermore, Dr. Hanna, following a 2005 visit reported, "[p]resently there is insufficient number of tender points on examination to confirm diagnosis of fibromyalgia syndrome." (Tr. 30). The ALJ found that medical records from January to September 2005 indicate "routine office visits, which suggests that there is no real distinction in the claimant's condition before or after the alleged onset date." (Tr. 30).

The ALJ next concluded that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 30). In regards to Plaintiff's claimed memory loss, the ALJ found the three examples given by Plaintiff at the second hearing unpersuasive. The report noted that "people

without mental health problems occasionally forget to turn off a stove," and "it is not unusual for people not to recognize someone whom they haven't seen for 20 to 30 years." (Tr. 31). Also noted was the fact that Plaintiff's family trusted her enough to leave her alone for extended periods of time, indicating "little concern for her memory lapses." (Tr. 31). The ALJ further cited a memory test given by Dr. Velez which showed only mild impairment, and another test given by Dr. Singh that yielded a score of 3/3. (Tr. 31).

Likewise, the knee pains and other pain complaints treated by Dr. McCalla from November 1999 to September 2005 yielded treatments of only stretching and exercise. (Tr. 30 (citing Exhibit 9F, p. 83)). The ALJ notes that June 2004 records indicate her hypertension was stable on present medications. (Tr. 32 (citing Exhibit 1F, p. 1-19)).

The ALJ further found that additional evidence of Plaintiff's fibromyalgia, provided on remand, is contradictory, indicating "no limitations of range of motion in the claimant's back, or in the joints of her extremities." (Tr. 32).

The ALJ also found "Dr. Rogers' functional assessment is lacking support of objective evidence by way of laboratory studies, radiographic evidence, or other means of testing, and relies to a larger degree on the subjective symptoms reported by the claimant." (Tr. 33). The ALJ noted that Dr. Rogers "does not opine that the claimant's condition is totally debilitating." (Tr. 33). The examination performed by Dr. Budzenski, ordered by the Appeals Counsel, indicates full range of motion in all joints of the claimant's extremities and her spine. (Tr. 34).

The ALJ ended the analysis by noting "the claimant is likely not able to perform light work and should be limited to sedentary work due to all complaints of pain with the additional postural and mental limitations described above." (Tr. 34). Furthermore, due to Plaintiff's memory problems, the ALJ conceded that Plaintiff is unable to perform any past relevant work. (Tr. 34).

C.  <u>Step Five Analysis</u>

The ALJ concluded based on Plaintiff's "age, education, work experience, and residual functional capacity," that there are indeed "jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 34).  The ALJ relied on testimony from the vocational expert, who testified that Plaintiff would be able to perform duties of such occupations as ticket checker, interviewer, hand production worker, inspector, material handler, and hand packager. (Tr. 34). The ALJ further noted that the vocational expert maintained his testimony was consistent with the information contained in the *Dictionary of Occupational Titles*. (Tr. 35).

The ALJ rejected validity of hypothetical questions asked by Plaintiff's counsel, as the assertions made are "unsupported by medical evidence as a whole." (Tr. 35).

**DISCUSSION**

**Legal Standards**

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A).  To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination.  *See McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; *see Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step.  Under the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant has an impairment that significantly limits her physical or mental ability to do basic work activities, the Commissioner will proceed to the next step.  Under the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps.

In the fourth step, the claimant's Residual Functional Capacity is evaluated to determine whether the claimant can pursue her past work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If she cannot, then the Commissioner evaluates the

claimant's ability to perform other work available in the economy.    20 C.F.R. §§ 404.1520(g), 416.920(g).

The plaintiff has the burdens of production and persuasion on steps one through four.    However, once the plaintiff shows an inability to perform her past work, the burden shifts to the Commissioner to show an ability to engage in some other type of substantial gainful employment.    *See Tom v. Heckler*, 779 F.2d 1250, 1253 (7th Cir. 1985); *see also Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984).

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. 405(g) which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Maggard*, 167 F.3d at 379 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

A court's function on review is not to try the case de novo or to supplant the ALJ's finding with the Court's own assessment of the evidence.  *See Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).    A court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.    *See Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Furthermore, in determining whether the ALJ's findings are supported by substantial evidence, credibility determinations made by the ALJ will not be

disturbed unless the finding is clearly erroneous. *See Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986), *cert. denied*, 479 U.S. 988 (1986).

However, the ALJ must articulate reasons for rejecting or accepting entire lines of evidence. *Godbey v. Apfel*, 238 F.3d 803, 807-08 (7th Cir. 2000). The ALJ is required to "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### Analysis

Plaintiff makes the following arguments: (1) The ALJ "played doctor" in his Step 3 analysis by failing to consider all available medical evidence, and thus lacked substantial evidence to find Plaintiff did not meet Listings 12.04 and 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1; (2) in the Step 5 analysis, the ALJ lacked substantial evidence to conclude Plaintiff's Residual Functional Capacity allowed her to perform sedentary work; and (3) the vocational expert's testimony was fatally flawed, as it relied on the O-Net System[1] instead of the *Dictionary of Occupational Title Job Descriptions* to assess available employment.

---

[1] The Occupational Information Network (O-Net) is a public database that contains hundreds of standardized and occupational-specific descriptors. It is being developed under the sponsorship of the US Department of Labor/Employment and Training Administration (USDOL/ETA). As the O-Net system was in fact not mentioned at any point in either hearing, the Court will not elaborate further on the adequacy of the O-Net system.

1. <u>The ALJ Did Not Consider All Available Evidence, and Therefore Fails the Threshold Requirement of Substantial Evidence.</u>

Plaintiff argues that the ALJ, in Step 3 of his analysis, "did not fully and fairly rely on the medical evidence in the file as a whole." (Pl.'s Br. 30). Plaintiff states that the ALJ failed to give proper weight to (1) Dr. Rogers, the treating physician, and (2) Dr. Velez, a psychologist who performed a consultative exam at the request of the agency.[2]

A. <u>The ALJ Did Not Give Controlling Weight to Dr. Rogers' Opinions, Plaintiff's Treating Physician.</u>

In general, the ALJ is to give controlling weight to the treating physician if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2) (2010). However, this presumption disappears once contradicting evidence is introduced, at which point the ALJ is entitled to give weight to various evidence as the circumstances dictate. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). If the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it. *See White v. Barnhart,* 415 F.3d 654, 659 (7th Cir. 2005). However, as previously mentioned, the ALJ must "minimally articulate[s] his reasons for crediting or rejecting evidence of disability."

---

[2]     Plaintiff also argues that the ALJ used an improper credibility factor by factoring in Plaintiff's non-compliance with her treatment plan. (Pl.'s Br. 29). This determination was made in the ALJ's first opinion, not in the second opinion. As the second opinion supercedes the first, the Court will not address this point.

*Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The issue at bar is not whether the ALJ properly weighed Dr. Rogers' testimony, but whether the "ALJ's findings were sufficiently supported to pass muster under our deferential standard of review." *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).

In *Ketelboeter v. Astrue*, the court found that because the treating physician's opinions were not backed by objective evidence, and were contradicted by consulting physicians, the ALJ was justified in discounting them. 550 F.3d 620, 625 (7th Cir. 2008). The court ruled similarly in *Skarbek v. Barnhart* when x-rays or other objective evidence did not back the treating physician's diagnoses. 390 F.3d 500, 504 (7th Cir. 2004). The present case is similar, as Dr. Rogers' diagnoses were contradicted by numerous sources, and lacked objective medical evidence.

Dr. Rogers maintains that Plaintiff's memory loss is severe, though he does not indicate any memory tests were performed. Furthermore, Dr. Kurth noted the impairment as mild in 2004. (Tr. 316). This was supported by MRI and EEG test results that were noted as "normal and unremarkable" by Plaintiff's treating physician in 2004. (Tr. 241). Later, in 2005, Plaintiff scored a 3/3 on a memory test given by Dr. Singh during a psychological evaluation. (Tr. 246). Finally, a 2007 test performed by Dr. Velez notes only mild impairment, as does a 2007 physical performed by Dr. Budzenski. (Tr. 702, 705).

Dr. Rogers' diagnosis of lack of concentration and inability to carry out even simple instructions is also contradicted. While Dr. Rogers noted severe limitations in his November 16, 2007 exam, Dr. Beers indicated the limitations as moderate,

while Dr. Valez noted Plaintiff's "attentional capacity is adequate." (Tr. 747, 742). Again, Dr. Rogers indicates no objective tests to support his medical conclusions.

The physical limitations noted by Dr. Rogers in his November 16, 2007 exam are also unsubstantiated and contradicted. While Dr. Rogers indicated Plaintiff could never climb, kneel, crouch or crawl, and needed the option to sit or lie down, Dr. Budzenski noted that Plaintiff was able to "walk on toes, walk on heels and tandem walk," as well as "perform a full squat maneuver without difficulty." (Tr. 772, 708). In fact, Dr. Budzenski ultimately concluded that Plaintiff "should be able to perform light work with occasional medium work eight hours a day." (Tr. 708). Dr. Rogers, on the other hand, indicated Plaintiff was disabled. (Tr. 773). The same exam given by Dr. Budzenski also contradicts Dr. Rogers' diagnosis of fibromyalgia; Dr. Budzenski found no evidence of fibromyalgia, as "claimant had no repeatable tender points." (Tr. 708).

Finally, the ALJ articulated numerous additional reasons for affording Dr. Rogers' assessments little weight. The ALJ noted that Plaintiff's counsel obtained letters from Dr. Rogers just prior to the November 29, 2007 hearing. This suggests they were generated not in the course of treatment, but as a means to secure benefits. (Tr. 32). Moreover, the ALJ noted that Dr. Rogers had very limited personal contact with the Plaintiff, as stipulated by Plaintiff's testimony. (Tr. 32 (citing Tr. 551) (stating Plaintiff was usually seen by Dr. Rogers' Physician's Assistant). The ALJ also pointed out that many of the limitations listed by Dr. Rogers are based on memory loss. He is a family doctor, not a psychiatrist, and thus

his opinions deserve less weight than that of a specialist in that field. (Tr. 32 (referring to 20 C.F.R. § 404.1527(d)(5) (2010) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.")) The Court concurs with the ALJ's reasoning above. The Court further agrees that much of Dr. Rogers' opinion seems to be based on Plaintiff's subjective complaints. This by itself is a valid reason for affording little weight to a treating physician's opinion. *See Ketelboeter*, 550 F.3d at 625. Combined with the additional reasons cited by the ALJ, the Court concludes the ALJ has fulfilled his obligations.

In sum, objective tests performed by the consultative specialists contradict a large portion of Dr. Rogers' opinion. Furthermore, the ALJ sufficiently articulated his reasons for discrediting Dr. Rogers' opinion, all of which are supported by substantial evidence. Thus, the Court finds that the ALJ was not required to give controlling weight to the treating physician.

B. <u>The ALJ Erred In Not Articulating Reasons for Discounting the Opinion of Dr. Velez.</u>

Generally speaking, when the ALJ fails to mention rejected evidence the case must be remanded, as "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Zblewski v. Schweiker* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). However, the ALJ need not discuss every piece of evidence – the ALJ is required "to discuss specific evidence only if that evidence goes uncontradicted." *Walker v. Bowen*, 834

24

F.2d 635, 643 (7th Cir. 1987). If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough. *Stephens*, 766 F.2d at 287.

Plaintiff contends that the ALJ's failure to articulate reasons for rejecting the psychological exam performed by Dr. Velez, which indicated a major depressive disorder and a GAF of 40, is a basis for remand. (Pl.'s Br. 27). The Court disagrees.

Nearly every doctor that examined Plaintiff noted a depressive disorder. The Court does not demand that the ALJ recite every piece of evidence in the record – as evidenced by the *Walker* decision, the Court does not require such inefficient rituals. 834 F.2d at 643. Furthermore, as is evident in the 12.04 listing, a mere diagnosis of depression is not sufficient for a claim of disability. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.04. There are numerous components that must be present in order to qualify as disabled. *Id.* The ALJ sufficiently discussed each element of 12.04, and backed all of his conclusions with objective medical evidence. *See* (Tr. 32).

The GAF score that Plaintiff contends is worthy of a disability finding is contradicted both internally and by other medical records. Dr. Velez's own report is not consistent with such a low GAF score. Dr. Velez noted that Plaintiff's "attentional capacity was adequate;" there was no evidence of delusions; her memory was only mildly impaired; and she could manage her own funds if granted disability. (Tr. 702). According to the DSM IV-TR GAF scale, a score of 40 indicates major impairments in several areas, such as work or school, family relations,

judgment, thinking, or mood. This is inconsistent with Dr. Velez's specific findings of adequate attentional capacity, lack of delusions, mild memory impairment, and ability to manage her own funds.

A more detailed Mental Residual Functional Capacity exam given a month later by Dr. Beers noted Plaintiff's severe depression. Despite this, Dr. Beers' much more specific findings contradict Dr. Velez's findings of such a low GAF score, as any limitations were noted as either mild or moderate. Also noteworthy is that a GAF score provided by Dr. Kurth, in 2004, was noted at 60. (Tr. 316). Perhaps most importantly, Plaintiff points to no law indicating that a GAF score by itself is sufficient to establish a disability. Indeed, such a determination is inconsistent with the Agency's intent. *See* 65 Fed. Reg. 50746, 50764-65 (2000) ("[i]t does not have a direct correlation to the severity requirements in our mental disorders listings.").

In sum, the Court finds that the ALJ did not err in failing to articulate his reasons for discounting the low GAF score provided by Dr. Velez. The GAF score was contradicted both by Dr. Velez's own report and by other objective medical evidence. The substantial evidence articulated by the ALJ is sufficient for this Court to trace the reasoning of his opinion.

2. The ALJ Lacked Substantial Evidence to Conclude Plaintiff's Residual Functional Capacity Allowed Her to Perform Sedentary Work.

Plaintiff argues that the ALJ improperly disregarded evidence provided by Dr. Rogers that states Plaintiff requires the option to sit or lie down at-will. (Pl.'s Br. 30 (citing Tr. 771)). In the same vein, Plaintiff also contends that the ALJ

should have taken into consideration the hypothetical questions posited by counsel, which resulted in a "no jobs" result. (Pl.'s Br. 30 (citing Tr. 874)).

This argument put forth by Plaintiff once again questions the manner in which the ALJ assessed the credibility and weight behind Dr. Rogers' opinions. The Court's previous discussion of the ALJ's decision to give less weight to Dr. Rogers' opinions is applicable here as well. Additionally, where the ALJ was entitled to give weight to Dr. Budzenski's physical, which stated Plaintiff is capable of "light work with occasional medium work," there was no need to consider the hypothetical questions asked by Plaintiff's counsel. (Tr. 708). The fact that the ALJ approved of only sedentary work, as opposed to light work, is evidence that Dr. Rogers' evaluations were indeed part of the ALJ's decision. Accordingly, for all of the reasons in the preceding section, the Court finds that the ALJ's conclusion that Plaintiff is capable of sedentary work is backed by substantial evidence. Moreover, the credibility determinations made by the ALJ were sufficiently articulated and followed the great weight of the evidence.

3. The Vocational Expert Improperly Relied on the O-Net System, Rather Than the Approved *Dictionary of Occupational Title Job Descriptions.*

The third argument raised by Plaintiff is that the vocational expert relied on the O-Net system to assess available jobs, instead of the *Dictionary of Occupational Titles*. (Pl.'s Br. 29). The Court has reviewed the transcripts extensively, and does not see where the O-Net system was mentioned. To the contrary, the vocational expert indicated his assessment was indeed based on listings in the *Dictionary of*

*Occupational Titles. See* (Tr. 873). Accordingly, the Court will disregard that portion of Plaintiff's brief as error.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 12) is DENIED, Plaintiff's Motion for the Entire Record to be Included (Doc. 13) is DENIED AS MOOT, and Defendant's Motion for Summary Affirmance (Doc. 15) is GRANTED.

ENTERED this <u>23rd</u> day of June 2010.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States District Judge
